UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| **Marcus Shoenthal**, | |
| Plaintiff, | |
| v. | Cause No. 4:21-cv-79 |
| **CITY OF SEYMOUR**, **Chief Bryant Lucas** (in his individual and official capacity), **Assistant Chief Greg O'Brien** and **Capt. John Watson** (in their individual capacities), | |
| Defendants. | |

## COMPLAINT AND REQUEST FOR JURY TRIAL

Mr. Shoenthal is suing the SEYMOUR POLICE DEPARTMENT ("SPD") through the

CITY OF SEYMOUR, Chief Bryant Lucas, AC Greg O'Brien, and Capt. John Watson for disability

discrimination and retaliation in violation of the EQUAL PROTECTION CLAUSE of the

14TH AMENDMENT and SECTION 504 of the REHABILITATION ACT. This lawsuit is filed in

the Southern District of Indiana because Defendants are residents of that District. Mr.

Shoenthal seeks all available relief and respectfully requests a trial by jury.

Respectfully submitted,

*/s/ Benjamin C. Ellis*

Benjamin C. Ellis
HKM EMPLOYMENT ATTORNEYS LLP
320 N. Meridian St., Ste. 615
Indianapolis, IN 46204
P/F    |   (317) 824-9747
Email  |   bellis@hkm.com

## 1.   INTRODUCTION

Mr. Shoenthal is an honorably discharged U.S. Army combat veteran, who developed PTSD during his service in Afghanistan. He joined the Seymour Police Department as a 911 dispatcher in 2017, with a dream of becoming a commissioned police officer. He thought he had achieved that dream when he was made a conditional offer of employment in spring 2020.

Today, Mr. Shoenthal is unemployed.

Defendants Chief Bryant and Capt. Watson rescinded Mr. Shoenthal's job offer in April 2020, passing him over in favor of an unqualified but nondisabled candidate.

Mr. Shoenthal complained of this discrimination, and Chief Bryant and Capt. Watson responded by subjecting his performance to heightened scrutiny. All the while, they strung him along with promises of a future promotion.

When that promised timeline stretched from months to years, Mr. Shoenthal hired an attorney. Three weeks after his attorney issued a letter on his behalf, Defendants retaliated by firing Mr. Shoenthal. Then, they opposed his application for unemployment insurance benefits – resulting in the wrongful denial of those benefits (at least temporarily).

Mr. Shoenthal now sues for the City of Seymour, Chief Bryant Lucas, and Capt. John Watson's disability discrimination and retaliation.

## 2.   JURISDICTION & VENUE

1.   This Court has original jurisdiction, under 28 U.S.C. § 1331, of Mr. Shoenthal's claims brought under 42 U.S.C. § 1983 and 29 U.S.C. § 794, because those claims arise under the Constitution and laws of the United States.

2.   This Court is a proper venue for this lawsuit, under 28 U.S.C. § 1391(b)(1), because Defendants are residents of Jackson County, Indiana, which is in the Southern District of Indiana.

## 3.   PARTIES

### 3.1.  Plaintiff

3.   Plaintiff Marcus Shoenthal is a resident of Jackson County, Indiana.

### 3.2.  Defendants

4.   Defendant CITY OF SEYMOUR was, is a political subdivision of the STATE OF INDIANA under Ind. Code § 36-1-2-11, residing in Jackson County, Indiana. The SEYMOUR POLICE DEPARTMENT is a department of the CITY OF SEYMOUR.

5.   Bryant Lucas is a resident of Jackson County, Indiana. He is the Chief of Police for the CITY OF SEYMOUR, who is "appointed by the Mayor and serve[s] at his or her pleasure." Seymour, IN Code of Ordinances Title III, § 30.18. Chief Lucas resides in Jackson County, Indiana.

6.   Greg O'Brien is a resident of Jackson County, Indiana. He is the
Assistant Chief of the SPD.

7.   John Watson is a resident of Jackson County, Indiana. He is a
Captain in the SPD.

## 4.   STATEMENT OF FACTS

8.   Mr. Shoenthal was a 911 dispatcher with the SPD from October 2,
2017 until his employment was terminated on March 26, 2021.

9.   In January 2020, Mr. Shoenthal began the process of applying to
become a commissioned police officer.

10.   He even received a conditional offer of employment in spring
2020, subject to passing a physical and mental evaluation to qualify for
PERF.

11.   That offer was revoked on April 23, 2020, allegedly due to an
August 2019 "sleep disturbance."

12.  The SPD has subsequently refused to consider commissioning
Mr. Shoenthal.

13.  Mr. Shoenthal is a disabled U.S. ARMY veteran.

14.  Due to his combat experience, Mr. Shoenthal developed PTSD.

15.  In the early years following his diagnosis, Mr. Shoenthal
experienced regular nightmares.

16.  As a result of his ongoing therapy, however, he has made
significant progress; he now only rarely has nightmares.

4

17.  After joining the SPD in 2017 as a 911 dispatcher, Mr. Shoenthal hoped to eventually become a commissioned officer.

18.  To that end, he took the SPD's required agility and written tests on January 11, 2020 - passing them all.

19.  He further passed the board interview on February 4, 2020 as the second highest rated candidate.

20. Accordingly, AC O'Brien made him a conditional offer of employment that spring, subject to a successful physical and mental evaluation for PERF purposes.

21.  As required by the SPD, Mr. Shoenthal submitted to evaluation by PUBLIC SAFETY MEDICAL on April 7, 2020.

22. Then, on April 23, 2020, he was called into a meeting with Capt. Watson, AC O'Brien, and Chief Lucas; they informed him he was failed by PSM due to an August 19 "sleep disturbance" noted in his VA medical file.

23. This "sleep disturbance" was not a nightmare and did not include any behavioral component.

24. AC O'Brien then told Mr. Shoenthal he would be eligible to go back to PERF in six months (October 2020), and to "stick with us and we have your back, we will send you back to PERF."

25. The SPD is not obligated to rely on PSM's opinion and could have sought out a second opinion as to Mr. Shoenthal's medical or psychological fitness.

26. In fact, the SPD has done so in the past, when it sent Ofc. Bradley Jay to multiple medical providers to get him approved by PERF before his 40th birthday.

27. Although disappointed by this initial rejection, Mr. Shoenthal continued his attempts to become a commissioned officer.

28. To that end, in May and June 2020, he attended and passed the pre-basic classes for the INDIANA LAW ENFORCEMENT ACADEMY.

29. Then, in July 2020, Mr. Shoenthal began to hear rumors that Kayla Griffin's name was being sent to ILEA to attend the next recruit class as a new hire.

30. At that time, Griffin had not passed any portion of the hiring process and the INDIANA STATE PERSONNEL DEPARTMENT had not started a new hiring process.

31. Accordingly, Griffin was not eligible for hire.

32. Despite her ineligibility, the board in the training room had badge number "118" listed, with Griffin's name next to it.

33. Unlike Mr. Shoenthal, who has PTSD, Ms. Griffin does not have any known disability.

34. Around that time, Mr. Shoenthal had several conversations with Capt. Watson and other officers about advancing in the hiring process.

35. In those conversations, Mr. Shoenthal learned that the SPD had no intention of sending him back to PERF in the fall on his previous application.

36. Instead, Mr. Shoenthal was required to begin a new hiring process from scratch.

37. In August 2020, the SPD announced a September agility test for its next new hire process.

38. Griffin was not required to attend that test as part of her hiring process and was instead administered a private agility test by Capt. Watson.

39. Mr. Shoenthal was not able to attend the agility test due to the death of his wife's grandmother.

40. Unlike Griffin, Mr. Shoenthal was not permitted to take a private agility test.

41. In October 2020, due to low dispatcher morale, Capt. Watson met with each dispatcher individually to discuss their concerns.

42. During his meeting with Capt. Watson, Mr. Shoenthal raised several concerns, including that he felt lied to when he was told to stick with the SPD, and that they would "have his back."

43. Capt. Watson did not address this concern directly, instead simply encouraging him not give up and stating, "you have plenty of time, Indiana extended the age cap to 40."

44. Mr. Shoenthal also noticed an emerging pattern following his April 23, 2020 meeting with the SPD's administration (including his supervisor, Toby Ortman).

7

45. Although he previously interacted with them regularly, he now rarely saw them, and they almost never spoke to him.

46. In that time, he estimates he only spoke with them a handful of times; he may have had a few more text exchanges with Ortman, but each were initiated by him.

47. Then, on January 26, 2021, Mr. Shoenthal met with Ortman and Capt. Watson, after he heard that Capt. Watson was criticizing him in the dispatch center.

48. Specifically, he heard that Capt. Watson had concerns for his attitude, had plans to speak with Chief Lucas about him, and may even terminate his employment.

49. No one had previously addressed these alleged concerns with Mr. Shoenthal.

50. During that meeting, Mr. Shoenthal expressed his continuing feelings that he was being misled by the SPD, and that it was wrongfully treating Griffin more favorably.

51. Again, the SPD had no substantive response for his concerns.

52. Instead, Capt. Watson told him to maintain a positive attitude and that Indiana was considering raising the age cap to 48.

53. Capt. Watson also falsely represented that AC O'Brien previously told Mr. Shoenthal that he would have to wait two years to reapply.

54. No documentation has ever been provided to support this alleged two-year rule.

55. It is also inconsistent with the SPD's decision to allow Mr. Shoenthal to attend pre-basic class in the late spring of 2020.

56. On January 27, the day after this meeting, Mr. Shoenthal found a *Statement of Employee Expectations* in his work mailbox.

57. The document directed him to sign that he "agree[d] to abide by these expectations and take corrective action when necessary."

58. This document was delivered department-wide, but the issues it raises are specifically tailored to Mr. Shoenthal based on the content of the January 26 meeting.

59. That day, Mr. Shoenthal asked that the SPD give him a copy of the SPD's evaluation.

60. He was given a May 1, 2020 letter from Dr. Candace Schmidt (post-dating his April 23 meeting with the SPD's administration), but not the underlying April 22, 2020 report.

61. That letter notes that Dr. Birdwhistell (his treating physician) had concluded "that Mr. Shoenthal was not experiencing sleep disturbances as of February 19, 2020."

62. As to his prior reported "sleep disturbance," Dr. Birdwhistell stated:

> [S]ymptoms reported on awakening were presumed by this physician at that time to be possibly related to nightmares, but there is no objective evidence that he is currently experiencing nightmares.

63. In her letter, Dr. Schmidt then represented that:

> Despite this information, another mental health professional documented inclinical notes dated January 31, 2020 that Mr. Shoenthal was experiencing symptoms of PTSD, including sleep disturbances, nightmares, and avoidant behavior at that time. Additionally, this clinician reported Mr. Shoenthal was experiencing symptoms of irritability and angry outbursts, which were attributed to PTSD, in July 2019.

64. Mr. Shoenthal has since investigated this claim with Dr. Birdwhistell, who clarified that this January 31, 2020 clinic note by William Radford, LCSW relates to previously reported - and not active - symptoms.

65. Dr. Schmidt closed her letter stating:

> Based on the documented recency of Mr. Shoenthal's PTSD symptoms, he is still receiving a failing grade at this time as he is considered a high risk for emotional distress, performance problems, and disciplinary incidents. A significant period of stability is required to deem him a low risk in these areas.

66. As the SPD knew, however, Mr. Shoenthal has not experienced emotional distress, performance problems, or disciplinary incidents in the many months since this May 1, 2020 letter.

67. Nor did this letter establish the arbitrary two-year waiting period identified by Capt. Watson in their January 26, 2021 meeting.

68. In the weeks following that meeting Mr. Shoenthal was subject to heightened scrutiny by the SPD's administration because of his complaints of discrimination.

69. On February 21, the SPD sent an officer to his home less than 20 minutes after calling him up for overtime.

70. It did so without making a second call to Mr. Shoenthal, as is the SPD's custom and practice.

71. Mr. Shoenthal has since learned that the dispatch supervisor expressly directed that he not be called a second time.

72. On March 3, Mr. Shoenthal (through counsel) sent a letter to the SPD complaining of disability discrimination and retaliation.

73. On March 26, the SPD terminated Mr. Shoenthal's employment.

74. The SPD did not tell Mr. Shoenthal its basis for terminating his employment.

75. That same day, Mr. Shoenthal applied for unemployment insurance benefits.

76. On March 29, 2021, Mr. Shoenthal filed a *Charge of Discrimination* with the EEOC, alleging disability discrimination and retaliation.

77. On April 13, Mr. Shoenthal received a determination from the INDIANA DEPARTMENT OF WORKFORCE DEVELOPMENT that his unemployment insurance benefits had been denied on the grounds that he had been "discharged due a violation of the employer's policy," that was "known, reasonable, and uniformly enforced."

78. Upon information and belief, DWD's determination of eligibility was based on false and defamatory statements by the SPD about the reasons it terminated his employment.

79. Instead, Mr. Shoenthal believes the SPD terminated his employment in retaliation for his complaints of disability discrimination and retaliation.

80. On May 4, 2021, Mr. Shoenthal submitted a notice of tort claim to Defendant CITY OF SEYMOUR.

## 5.  STATEMENT OF CLAIMS[1]

### 5.1.  Disability discrimination in violation of the Equal Protection Clause of the 14th Amendment (42 U.S.C. § 1983)

81.  Mr. Shoenthal suffers from PTSD, a disability.

82.  Mr. Shoenthal was qualified to perform the duties of police officer.

83.  Lucas, O'Brien, and Watson refused to commission Mr. Shoenthal as a police officer in the SEYMOUR POLICE DEPARTMENT.

84.  This decision is an official policy of the CITY OF SEYMOUR because Lucas was its final policymaker for police hiring decisions.

85.  Defendants would have commissioned Mr. Shoenthal as police officer if he did not have PTSD, but everything else had been the same.

86.  Mr. Shoenthal was harmed by Defendants' violation of his rights under the EQUAL PROTECTION CLAUSE of the 14TH AMENDMENT.

### 5.2.  Disability discrimination in violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794)

87.  Mr. Shoenthal suffers from PTSD, a disability.

88.  Mr. Shoenthal was qualified to perform the duties of a police officer.

---

[1]  Mr. Shoenthal intends to amend this *Complaint* to include additional claims after they have been fully exhausted with the EEOC and the CITY OF SEYMOUR's tort claim process.

89. The CITY OF SEYMOUR refused to commission Mr. Shoenthal as a police officer in the SEYMOUR POLICE DEPARTMENT.

90. The CITY OF SEYMOUR would have commissioned Mr. Shoenthal as police officer if he did not have PTSD, but everything else had been the same.

91. The CITY OF SEYMOUR receives federal funding.

92. The SEYMOUR POLICE DEPARTMENT receives federal funding.

93. Mr. Shoenthal was harmed by the CITY OF SEYMOUR's violation of Section 504 of the Rehabilitation Act.

## 5.3.  Retaliation in violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794)

94. Mr. Shoenthal complained to Defendants that they were discriminating against him in their police officer commissioning process because of his disability, PTSD.

95. Defendants retaliated against Mr. Shoenthal because of his complaints of disability discrimination, including by:

   a. subjecting Mr. Shoenthal's work performance to heightened scrutiny;

   b. terminating Mr. Shoenthal's employment; and

   c. opposing Mr. Shoenthal's application for unemployment insurance benefits.

96. The CITY OF SEYMOUR receives federal funding.

97. The SEYMOUR POLICE DEPARTMENT receives federal funding.

98. Mr. Shoenthal was harmed by the CITY OF SEYMOUR's violation of SECTION 504 of the REHABILITATION ACT.

## 6.   PRAYER FOR RELIEF

Mr. Shoenthal respectfully requests that judgment be entered in his favor, and against the City of Seymour, Chief Bryant Lucas, AC O'Brien, and Capt. John Watson, on all claims, for their violations of the EQUAL PROTECTION CLAUSE of the 14TH AMENDMENT, and SECTION 504 of the REHABILITATION ACT. He requests all available relief on his claims, including the following:

    a.    Compensatory damages (including lost wages and emotional distress);

    b.    Punitive damages;

    c.    Enjoin defendants from further defamation;

    d.    Reinstatement; and

    e.    Prejudgment and postjudgment interest.

## 7.   JURY DEMAND

As required by Fed R. Civ. P. 38(b), Mr. Shoenthal respectfully requests a trial by jury on all issues so triable.