## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## NEW ALBANY DIVISION

| | | |
|---|---|---|
| MARCUS SHOENTHAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-00079-TWP-KMB |
| | ) | |
| CITY OF SEYMOUR, | ) | |
| BRYANT LUCAS Chief in his individual and | ) | |
| official capacity, | ) | |
| GREG O'BRIEN Assistant Chief in his individual | ) | |
| capacity, | ) | |
| JOHN WATSON Capt. in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY

This matter is before the Court on a Motion for Summary Judgment filed by Defendants the City of Seymour (the "City"), Bryant Lucas ("Chief Lucas"), Greg O'Brien ("Assistant Chief O'Brien"), and John Watson ("Captain Watson") (collectively, "Defendants") (Filing No. 77). Also, before this Court is Shoenthal's Motion for Leave to File Surreply in Opposition to Summary Judgment (Filing No. 104). Following termination from his position as a civilian dispatcher for the Seymour Police Department (the "SPD"), Plaintiff Marcus Shoenthal ("Shoenthal") initiated this action against the City, the chief of police, assistant chief and a captain in the SPD, alleging violations of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act (the "Rehabilitation Act"), 42 U.S.C. § 1983 ("Section 1983") and asserting a defamation claim.[1]

---

[1] In his amended response, Shoenthal concedes summary judgment on the defamation claim (Filing No. 96-1 at 62). That claim is thereby **dismissed**.

Defendants seek judgment as a matter of law.  For the following reasons, Shoenthal's Motion for Leave to File Surreply is **granted**, and Defendants' Motion for Summary Judgment is **granted**.

## I.    BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Shoenthal as the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

### A.    Shoenthal's Employment and the City's Policies

Shoenthal began working for SPD as a civilian 911 dispatcher in October 2017 (Filing No. 92-19 at 1).  He was considered a good employee and did not have any disciplinary issues (Filing No. 79-1 at 16-17, 25).  The dispatch department of SPD is staffed by civilian employees, rather than by police officers (Filing No. 79-5 at 5-8; Filing No. 79-2).  The civilian employees, including Shoenthal, were governed by the City's disciplinary policy contained in the general Employee Handbook (Filing No. 79-3 at 50-51, Filing No. 81-1 at 64).  In the section titled, "Disciplinary Policy," the Employee Handbook listed in all capital letters, offenses for which an at-will employee would receive "discipline up to and including immediate termination" (Filing No. 79-4 at 14).  Relevant to this case, the list of offenses included: "Insubordination or failure to follow instructions," "Unauthorized use . . . , or damage to office property," "Making or publishing false, vicious, or malicious statements concerning . . . the employees of the City," "Unlawful discrimination against or harassment of co-workers," "Threatening . . . employees," "Using abusive, profane, or threatening language," and "Immoral or indecent conduct."  *Id.* at 14-15.

### B.    SPD's Participation in the 1977 Fund and Commissioning of Police Officers

The City is required to participate in the 1977 Police Officers' and Firefighters' Pension and Disability Fund ("1977 Fund"), which is administered by the Indiana Public Retirement

2

System, formerly known as the Public Employees' Retirement Fund ("PERF").  *See* Ind. Code §§ 36-8-8-3, -2.3.  All full-time police officers are required to be enrolled in the 1977 Fund.  Ind. Code § 36-8-8-1.  If a city participates in the fund, Indiana law requires its police officers pass a physical and mental examination set by the trustees of the Indiana Public Retirement System and administered as the local board sees fit.  *See* Ind. Code §§ 36-8-8-19, -2.3. Only applicants "who pass[] the baseline statewide physical and mental examination under IC 36-8-8-19" shall become members of the 1977 Fund.  Ind. Code § 36-8-3.2-2(b).

Anyone desiring to become a police officer in Seymour, Indiana, would go through the process established by Indiana law. SPD applicants would have to pass the SPD physical agility test, take a written examination administered by a third-party company, and, if the applicant scores high enough, interview with the SPD interview board (Filing No. 79-5 at 10-11; Filing No. 92-18 at 16; Filing No. 92-22 at 4-5, 29-30).  Next, the SPD will give the applicant a conditional offer conditioned on passing the mental and physical examinations pursuant to Indiana Code § 36-8-8-19 (Filing No. 92-18 at 16, 18; Filing No. 92-21 at 63-64; Filing No. 92-22 at 5, 22-23).  SPD used the company "Public Safety Medical" to administer the mental examination (Filing No. 79-1 at 82-83; Filing No. 92-22 at 33; Filing No. 92-24 at 23).  If the applicant passes the mental and physical examinations, the results are presented to the local board and the Police Pension Board of Trustees reviews the results and makes a recommendation to the Indiana Public Retirement System, formerly PERF (Filing No. 79-5 at 10-11; Filing No. 79-6 at 6-7; Filing No. 92-22 at 31).[2]

The Indiana Public Retirement System then approves or denies the candidate and submits the applicant to the Seymour Board of Public Works and Safety for final approval (Filing No. 79-

---

[2] *See* Seymour, Ind. Ordinances § 31.51 (1992) ("There shall continue to be a Police Pension Board of Trustees to perform certain duties prescribed by I.C. 36-8-6 (1925 Fund) and I.C. 36-8-8 (1977 Fund) concerning the statutory pensions of city police.").

5 at 11; Filing No. 92-22 at 31).[3]   An applicant must complete all steps of the process to be commissioned a Seymour police officer (Filing No. 79-5 at 18; Filing No. 79-6 at 13).

**C.**   **Shoenthal's Application Process**

Shoenthal aspired to become a police officer, and he submitted an application to the SPD in November 2019 for the Spring 2020 hiring cycle (Filing No. 92-18 at 62-65). As such, he was subject to the above requirements prescribed by Indiana law and the SPD.

**1.**   **Written Application, Physical Agility Test, and Conditional Offer in the Spring 2020 Hiring Cycle**

Shoenthal completed the initial written application and disclosed that he had been diagnosed with post-traumatic stress disorder ("PTSD") following deployments with the military to Iraq and Afghanistan (Filing No. 80-1 at 14).  He passed the physical agility test and excelled in the written examination and during his interview (Filing No. 92-18 at 17-18; Filing No. at 79-6 at 47; Filing 92-22 at 4-5).  At this point in the application process, he was considered the second-best candidate in the hiring cycle (Filing No. 92-18 at 17-18; Filing 92-22 at 5).  Shoenthal received a conditional offer to be a Seymour police officer, contingent on passage of the Public Safety Medical physical and mental examinations (No. 92-18 at 18; Filing 92-22 at 5-6).

**2.**   **Public Safety Medical Mental Examination and Revocation of Conditional Offer**

In April 2020, Public Safety Medical conducted Shoenthal's mental examination (Filing No. 92-3 at 1).  Dr. Candace Schmidt ("Dr. Schmidt") examined Shoenthal to assess his ability to adapt to the social, emotional, and behavioral demands of being a police officer.  *Id.* His prior mental health treatment records were not initially available, but Dr. Schmidt was able to ascertain

---

[3] *See* Seymour, Ind. Ordinances § 31.31 (1987) ("The Board of Public Works and Safety is, by statute, the governing body of the city Police Department.").

that Shoenthal was presently taking multiple psychiatric medications to deal with a history of mental health symptoms (Filing No. 92-1).   In her report, Dr. Schmidt noted several inconsistencies between Shoenthal's self-report regarding his mental health history and available records. (Filing No. 92-3 at 3).  For example;

> Mr. Shoenthal reported he was diagnosed with PTSD, unspecified mood disorder related to a TBI, and anxiety in 2012.  Available mental health records indicate he was also diagnosed with mild neurocognitive disorder related to a TBI and alcohol use disorder, moderate severity.  …  Mr. Shoenthal reported he has participated in psychotherapy since 2012.  According to available mental health records, Mr. Shoenthal was inactive in psychotherapy from 2015 to 2018.  …  Mr. Shoenthal reported his mental health symptoms are currently stable indicating he last experienced active symptoms at least 12 months ago.  Additionally, he denied experiencing social and occupational impairment resulting from current mental health symptoms.  Mr. Shoenthal's self-report is contradicted by his VA mental health records.  According to records dated January 31, 2020, he continues to exhibit the following symptoms of PTSD:   sleep disturbances, nightmares regarding past traumatic events, and avoidant behaviors.

*Id*. at 5-6. Records from August 2019 indicated Shoenthal exhibited irritability and angry outbursts, and records from April 2019 indicated an increase in depression symptoms.  *Id.* at 4. After reviewing the records and evaluation, Dr. Schmidt determined that "Overall, Mr. Shoenthal's current mental health symptoms indicate that he is not an acceptable candidate at the current time. He is considered a high risk for emotional distress, performance problems, and disciplinary incidents.  Therefore, he has received a failing grade and cannot be recommended for further consideration at this time." *Id*. at 6. In her summary, Dr. Schmidt opined that Shoenthal's current PTSD symptoms could predispose him to work-related problems and: "A significant period of stability is required to deem him a low risk in this area."  *Id.* at 5.

Once SPD received the results, Assistant Chief O'Brian called Public Safety Medical to see if Shoenthal could be retested (Filing No. 79-6 at 13).  Public Safety Medical recommended Shoenthal could be retested in two years and explained that they would like to see him symptom

free for the same amount of time that he had shown symptoms.  *Id.* at 13-14.  Shoenthal was

advised that he failed the mental examination and that he could not be hired as a police officer at

that time[4] (Filing No. 79-3 at 11; Filing No. 79-6 at 18; Filing No. 92-21 at 3).  Shoenthal's

conditional offer was revoked on April 23, 2020 (Filing No. 92-21 at 64).

### 3.    <u>Shoenthal's Involvement in Fall 2020 Hiring Cycle</u>

Although Shoenthal's conditional offer was revoked, Defendants gave him mixed signals

regarding his ability to be retested.  Shoenthal felt like he was being strung along – first he was

told that he could retest in six months, then at the next agility test, and eventually was told he could

not retest for two years (Filing No. 92-18 at 23, 60-61).

The SPD's next hiring cycle occurred in Fall 2020.  *Id.* at 25-26.  Shoenthal expressed his

interest in reapplying for a police officer position.  *Id.* at 26. Captain Watson told Shoenthal that

he could probably use his previous agility test and application to apply and that he might not have

to go through the entire hiring process again.  *Id.* at 26-27.  Shoenthal did not confirm with any

other member of the SPD the procedures for reapplication.  *Id.* at 29-30.  The Seymour Police

Department had scheduled a physical agility test for the Fall 2020 cycle.  *Id.* at 29.  Shoenthal

could not attend this agility test due to a death in the family and, although he communicated his

family situation, he failed to notify anyone that he would not be attending the agility test and

subsequent written examination.  *Id.* at 27, 29-30.  Instead, in October 2020 after the police

commissioning process had already begun, Shoenthal requested a private agility test which was

denied by Defendants.  *Id.* at 28.  In a meeting he requested, Shoenthal discussed with Captain

Watson the timing issue related to passage of the mental examination and his return to Public

---

[4] Mr. Shoenthal's amended complaint alleges he was called into an April 23, 2020 meeting with Chief Lucas, Assistant Chief O'Brien, and Captain Watson, who informed him "he was failed by PSM due to an August 19 'sleep disturbance' noted in his VA medical file" (Filing No. 19-4 at 5).

Safety Medical (Filing No. 79-7 at 60; Filing No. 92-21 at 73).  Shoenthal perceived that the Defendants were not transparent or clear about the timeline for when he could retake a Public Safety Medical psychological evaluation or the requirements for applying for the police officer position in the Fall 2020 hiring cycle (Filing No. 79-7 at 61-67).

**D.      Other Candidates' Application Processes**

Kayla Griffin ("Griffin") was another Spring 2020 police officer candidate (Filing No. 79-7 at 56-57).  Griffin failed the physical agility test – the first step in the SPD application process (Filing No. 79-1 at 68-69). She was later hired as a 911 dispatcher (Filing No. 79-7 at 57).

Unlike Shoenthal, Griffin reapplied to be a police candidate in the Fall 2020 hiring cycle (Filing No. 79-1 at 69).  The night before the agility test and written examination, Griffin was scheduled to work a night shift as a dispatch.  *Id.*  Since her work shift ended an hour before the test began, the SPD permitted her to take the agility test later that day so that she could rest from her shift.  *Id.* at 69-70.  She attended the written examination with the other candidates that followed the originally scheduled agility test (Filing No. 79-6 at 61).  Griffin passed the agility test and met all of the other requirements to be a police officer (Filing No. 79-1 at 69).

As it pertains to the mental examination, for the eighteen years that he had served as pension secretary, Assistant Chief O'Brien had never submitted a SPD candidate for a second opinion after they failed the mental examination (Filing No. 79-6 at 45).  In response to being asked whether he knew of any candidate that had failed the psychological examination for whom the SPD had solicited a second opinion, Shoenthal answered that he did not know anybody else who had failed the psychological evaluation (Filing No. 79-7 at 51-52).

**E.      Shoenthal's Behavioral Issues and Termination**

Captain Watson first observed performance or conduct problems with Shoenthal in November 2020, corresponding with the selection of Griffin to become a police officer (Filing No.

79-1 at 26-27).  He believed Shoenthal's frustrations stemmed from the lack of transparency in the timeline of his ability to become a police officer.  As time passed, Shoenthal's distrust and frustration grew (Filing No. 92-18 at 35-36; Filing No. 19 at 3).  Initially, Shoenthal began by "starting drama, starting to call [Griffin] some names" (Filing No. 79-1 at 27).  At a dispatch shift switch, Shoenthal disregarded Griffin's attempt to explain that shift's events, which included an officer-involved shooting.[5]  *Id.* at 28.  Captain Watson was made aware of these initial complaints, and he asked Shoenthal's supervisor--Toby Ortman--to have a discussion with Shoenthal and share that such behavior was unacceptable.  *Id.* at 29-31.

The complaints escalated to the point that Captain Watson was receiving weekly complaints about Shoenthal's behavior that progressively got worse.  *Id.* at 30.  Shoenthal was accused of referring to Griffin using the derogatory term, "thunder cunt," and complaints were received that Shoenthal had relieved a shift by telling other dispatchers to "get the fuck out of here," he had made rude comments to dispatcher Brittany Kinworthy ("Kinworthy") during her shift change, and he refused to do portions of his dispatcher role, such as helping a new co-worker with orientation and training (Filing No. 79-1 at 30-31, 38-40).  In reporting Shoenthal's actions to Captain Watson, dispatchers Kinworthy and Griffin broke down in tears (Filing No. 79-1 at 97).

Shoenthal denies using the derogatory terms and he "never called Ms. Griffin a 'thunder cunt' or a 'dumpster slut,' or said she was sleeping with anyone to get her position in the January 26 meeting, March 26 meeting, or anywhere else" (Filing No. 92-19 at 8).

In January 2021, Shoenthal had a lengthy conversation with his supervisor, Toby Ortman ("Ortman") after hearing rumors that he was going to be fired (Filing No. 79-7 at 72; Filing No.

---

[5] Mr. Shoenthal, who "arrived early because of the shooting," states in his declaration: "I was well aware of the details of the situation before the start of my shift.  Nonetheless, I listened to the pass down, and acknowledged Mr. Moss and Ms. Griffin when they left."  (Filing No. 92-19 at 8.)

92-19 at 3). They discussed his behavior and potential frustrations causing that behavior (Filing No. 92-19 at 3-4). Ortman encouraged him to continue with the department as a dispatcher, and addressed his perception that he believed Shoenthal was "starting to get an attitude" (Filing No. 92-19 at 4). Ortman recommended talking to Captain Watson about his frustrations with the police officer hiring process and the favoritism of others, particularly Griffin. *Id.*

In late January 2021, Shoenthal met with Captain Watson and raised his concerns about favoritism in the hiring process, conduct in the dispatch center, and the Public Safety Medical mental examination recommendation (Filing No. 92-18 at 41-43, 46). Captain Watson sympathized with Shoenthal, and said he needed to focus on doing his job and stop causing drama, in essence giving him a "knock it off talk[]" (Filing No. 92-21 at 13-14). Captain Watson also clarified with Shoenthal that the Public Safety Medical recommendation was that Shoenthal would not pass the mental examination until a two-year observation window of time had passed (Filing No. 92-18 at 44-45). To address the behavioral issues among dispatchers, Captain Watson made all of the dispatchers sign a statement of employee expectations to improve morale (Filing No. 79-1 at 36-37, 95-96).

In February 2021, Ortman reprimanded Shoenthal for the way Shoenthal talked to him over the telephone when asked to come in for overtime (Filing No. 92-14; Filing No. 79-1 at 38). Later that month Ortman told Captain Watson that he had received additional complaints about Shoenthal from his co-workers (Filing No. 79-1 at 47-49).

Before Captain Watson could act, Defendants became aware that Shoenthal, through counsel, had sent to Defendants a six-page letter on March 3, 2021, addressed to Chief Lucas detailing Shoenthal's account of events beginning in early 2020 until the present and alleging that "[a]ll of the[] circumstances indicate that the SPD is unlawfully discriminating against Shoenthal

based on his disability and retaliating against him for complaining about that discrimination." (Filing No. 80-7.)  Within a few weeks, Captain Watson was aware that rumors were spreading around the department and Shoenthal was reportedly openly discussing the lawsuit at work and that Griffin would be named in it (Filing No. 79-1 at 66-67; Filing No. 92-7).  By the end of March, two dispatchers, Kinworthy and Alex Moss ("Moss"), quit their jobs stating it was due to Shoenthal's behavior (Filing No. 92-21 at 32-33).  Captain Watson notified Assistant Chief O'Brien and Chief Lucas that two dispatchers had resigned because of Shoenthal.  *Id.*  Chief Lucas met with the City of Seymour's Human Resources Director, Dawn White ("White") and they Shoenthal's conduct. White suggested that Shoenthal be placed on a performance enhancement plan (Filing No. 92-23 at 7; Filing No. 92-22 at 16).

In preparation, for the meeting with Shoenthal, White reviewed his personnel file, her notes from meeting with Chief Lucas and Assistant Chief O'Brien, and the employee handbook (Filing No. 81-1 at 12-15, 45-47; Filing No. 81-2 at 11).  Before the meeting, White talked to Moss about his departure from the department (Filing No. 81-1 at 16-19).  White contends that Moss resigned because of Shoenthal's behavior, and Moss reported that many of the incidents that were the subjects of complaints against Shoenthal were true.  *Id.*  White was aware that Shoenthal had sent a letter to the City but did not know any details concerning or surrounding that letter.  *Id.* at 84-85.

The events during the meeting which ended in Shoenthal's termination are disputed between the parties[6].  At this stage of the proceedings, the Court accepts Shoenthal's version of the meeting. According to Shoenthal, White generally stated that there were complaints against him,

---

[6] White contends that she addressed Shoenthal's behavioral issues with him.  (Filing No. 81-1 at 24-25).  He admitted to tossing a headrest on his desk and called Griffin a "dumpster whore" and made disparaging comments that she was selected to be a police officer "because she sleeps with everybody."  *Id.* at 25-27.  After notifying Shoenthal that he would be terminated, White contends that she proceeded to fill out a blank disciplinary action form, signifying that Shoenthal violated portions of the employee handbook.  *Id.* at 34.

and that he was creating a hostile work environment including his bad attitude and use of vulgar language (Filing No. 92-19 at 5-6). He admits she asked him whether he had thrown a headrest, to which he explained he tossed it in haste to answer a 911 call. *Id.* at 5-6. He denied calling a coworker a "dumpster whore" or "thunder cunt," and he did not lose his temper, raise his voice, use vulgar language, or leave the chair he was sitting in. *Id.* at 6. Instead, he expressed frustrations about the department, not anger directed at White (Filing No. 92-18 at 52; Filing No. 92-21 at 46). Then, White terminated him (Filing No. 92-18 at 52-53; Filing No. 92-19 at 7). Shoenthal did not see White preparing a disciplinary form, and he was never asked to sign one (Filing No. 92-19 at 5; Filing No. 92-18 at 54).

White felt uneasy about Shoenthal's demeanor during the meeting, and she observed that he was red in the face, raised his voice, and was visibly angry to a point that she did not feel safe in the room. (Filing No. 81-1 at 29, 30, 59, 72). She then decided that he should be terminated on the spot. *Id.* at 25, 32-33, 35-36. After the meeting, White met with Assistant Chief O'Brien and Chief Lucas to inform them about her decision to terminate Shoenthal. *Id.* at 41-42.

**F.**     **Unemployment Insurance Benefits Application and EEOC Charge**

Following his termination, Shoenthal filed for unemployment insurance with the Indiana Department of Workforce Development (Filing No. 92-19 at 7). Because he was terminated for cause according to the documentation provided by the City, his benefits were denied (Filing No. 81-3). The application was also denied on appeal (Filing No. 81-4).

Shoenthal filed an Equal Employment Opportunity Commission ("EEOC") charge against the City in late March 2021 alleging that the City discriminated against him because of its failure to commission him as a police officer (Filing No. 81-5). The EEOC charge also alleged that the City retaliated against Shoenthal after he complained about the discrimination. *Id.*

G.    **Bankruptcy**

On March 31, 2019, Shoenthal filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Indiana.  *See In re Marcus William Shoenthal et al.*, Cause No. 19-90485-AKM-13 (Bankr. S.D. Ind. 2019) (Filing No. 1).  As part of the bankruptcy filing, Shoenthal submitted a schedule of property that stated that he had no claims against third parties.  *Id.* at 19.

As described above, on March 28, 2021, Shoenthal filed a charge of commission with the EEOC alleging claims against the Defendants related to his employment, and on May 4, 2021, his counsel sent a torts claim notice addressed to the administrative assistant to the mayor of Seymour, Indiana, enclosing the March 3, 2021 letter notifying Chief Lucas that Shoenthal suffered from disability discrimination and retaliation in violation of the ADA and Equal Protection Clause, and that his employment was wrongfully terminated (Filing No. 75-2). These letters contained a detailed description of the claims and damages.  *Id.*  A week later, he filed this lawsuit on May 11, 2021 (Filing No. 1).

On December 30, 2021, Shoenthal made modifications to his bankruptcy disclosure schedules relating to his current employment but did not make amendments to disclose this lawsuit. *In re Marcus William Shoenthal et al.*, Cause No. 19-90485-AKM-13 (Filing No. 57). Shoenthal admits that he had not disclosed the civil lawsuit before this Court to the bankruptcy trustee but that he had intended to (Filing No. 79-7 at 7-11). On October 4, 2022, Defendants filed a motion to dismiss on the basis that Shoenthal lacked standing and jurisdiction to pursue his claims as he had not disclosed this lawsuit to the bankruptcy estate and bankruptcy court (Filing No. 59). Before responding to the motion to dismiss, Shoenthal amended his bankruptcy schedule to include a disclosure that stated "[o]n May 4, 2021, Shoenthal submitted notice of tort claim to City of Seymour" (Filing No. 71-4 at 4-5). During that time, Shoenthal's counsel, the bankruptcy trustee,

and Shoenthal's bankruptcy counsel entered into an agreement stating that Shoenthal gave notice to the trustee of his May 4, 2021 notice of tort claim and granting Shoenthal permission to pursue the case on behalf of the bankruptcy estate (Filing No. 71-3).  The agreement was filed in the bankruptcy proceeding, *In re Marcus William Shoenthal et al.*, Cause No. 19-90485-AKM-13 (Filing No. 63).

Defendants motion to dismiss was denied and Defendants filed the summary judgment motion which is before the Court.

## II.   LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."  *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "The opposing party cannot meet this burden with conclusory

statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Shoenthal as the non-moving party and draws all reasonable inferences in his favor. *Bright v. CCA*, No. 10-cv-1690, 2013 WL 6047505, at *3 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* (citation and quotation marks omitted); *see Reed v. Brex, Inc.*, 8 F.4th 569, 578 (7th Cir. 2021) ("Summary judgment is the proverbial put up or shut up moment in a lawsuit." (quotation marks and citations omitted)).

## III.   <u>DISCUSSION</u>

Shoenthal brings claims for Disability discrimination in violation of the Equal Protection Clause of the 14th Amendment (42 U.S.C. § 1983); Disability discrimination in violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794); Retaliation in violation of Section 504 of the Rehabilitation Act (29 U.S.C. § 794); Disability discrimination in violation of the Americans with Disabilities Act (42 U.S.C. § 12112(a); and Retaliation in violation of the Americans with Disabilities Act (42 U.S.C. § 12112(a).

14

Defendants seek summary judgment on all claims. They first maintain that Shoenthal should be judicially estopped from pursuing the claims because he concealed them from the bankruptcy court and trustee. Regarding his Section 1983 claim, they argue that Shoenthal cannot demonstrate the alleged discrimination was not rationally related to a legitimate state interest and they assert the individual defendants have qualified immunity. Concerning his discrimination claims under the ADA and Rehabilitation Act, Defendants argue that Shoenthal was not a "qualified individual" and the employment action of refusing to commission him was not because of his PTSD. Defendants lastly argue that his retaliation claims should be dismissed because his discrimination complaint was not the "but-for" cause of his termination and that he did not identify heightened scrutiny or the opposition to his unemployment benefits in his related EEOC charge.

The Court will first address Shoenthal's request for leave to file a surreply, and then turn to the summary judgment arguments.

**A.  Motion to File Surreply**

Shoenthal contends the Defendants improperly designated two new declarations for the first time in their reply brief, a declaration, from Moss (Dkt. 102-2) and one from Defendant Greg O'Brien (Dkt. 102-3). He seeks leave to file a surreply "limited strictly to addressing these declarations, and Defendants' request that the Court nonetheless rely on false testimony by White." (Filing No. 104 at 2.)

Local Rule 56-1(d) allows a party opposing summary judgment to file a surreply brief "only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." S.D. Ind. L.R. 56-1(d). As Shoenthal argues, the "purpose for having a motion, response, and reply is to give the movant the final opportunity to be heard and to rebut the non-movant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion." *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, No. 09-cv-340, 2010 WL

1258052, at *2 (S.D. Ind. Mar. 25, 2010).  "New arguments and evidence may not be raised for the first time in a reply brief.  Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief."  *Reis v. Robbins*, No. 14-cv-63, 2015 WL 846526, at *2 (S.D. Ind. Feb. 26, 2015) (citations omitted).  This serves to prevent the nonmoving party from being sandbagged.  *Id.* (citations omitted). "Courts allow a surreply brief only in limited circumstances to address new arguments or evidence raised in the reply brief or objections to the admissibility of the evidence cited in the response."  *Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils.*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019).  A party, however, may expand upon and clarify arguments in its reply brief. *Reis*, 2015 WL 846526, at *2 (citing *Ripberger v. Corizon, Inc.*, No. 11-cv-1394, 2012 WL 4340716, * 1 (S.D. Ind. Sept. 20, 2012)).

The Court agrees that the exhibits that Defendants attached in their amended appendix are set forth for the first time in their reply brief.  Moss signed his declaration on March 10, 2023, while Assistant Chief O'Brien signed his declaration on March 27, 2023 — both of which succeeded Shoenthal's February 28, 2023, deadline to file his response brief.  The Court finds it equitable to allow Shoenthal to file his surreply in response to the new declarations.  Thus, Shoenthal's Motion to File Surreply is **granted**.

### B.   Defendants' Motion for Summary Judgment

Defendants move for summary judgment on Shoenthal's claims for Section 1983 Equal Protection violations, disability discrimination and retaliation under the Americans with Disabilities Act and Section 504 of the Rehabilitation and defamation. As the Court noted earlier, Shoenthal concedes summary judgment on the defamation claim (Filing No. 96-1 at 62), and summary judgment is **granted** on that claim.

The Court will first address whether Shoenthal is judicially estopped from pursuing his claims against Defendants, as it would be dispositive of his ability to pursue the claims in this case.

1. **Judicial Estoppel**

In the March 1, 2023 Order denying Defendants' Motion to Dismiss, the Court considered Defendants' argument that Shoenthal had intentionally withheld the existence of the present lawsuit from the bankruptcy court, the trustee, and his creditors, and observed that the summary judgment stage of the litigation was the proper juncture at which to consider the nature, extent, and timing of the disclosures and whether the notice Shoenthal provided was misleading.   That time is now.

"[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal quotation marks omitted).   To prevail on a judicial estoppel claim, the Defendants must demonstrate that Shoenthal intentionally concealed the lawsuit and benefited from the failure to disclose. *Williams v. Hainje*, 375 F. App'x 625, 627 (7th Cir. 2010); *Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006).   The Defendants argue that Shoenthal's delay in disclosing the lawsuit, and his decision to disclose the lawsuit only after the Defendants filed a motion to dismiss on this basis is sufficient evidence to show Shoenthal's intent to conceal.

Defendants' arguments are well-taken.   For over a year into the litigation, Shoenthal neglected his duty to disclose the lawsuit to the bankruptcy court.   He even testified in his deposition that he had not disclosed the filing of the lawsuit to the bankruptcy trustee but that he had intended to do so (Filing No 79-7 at 33).   Eventually, Shoenthal disclosed this lawsuit in an amended bankruptcy schedule. *See In re Marcus William Shoenthal et al.*, Cause No. 19-90485-AKM-13 (Filing No. 64).   On his Form 106A/B, Shoenthal discloses that, "[o]n May 4, 2021, Shoenthal submitted a notice of tort claim to City of Seymour." *Id.*   The Form A/B also lists the attorney in this matter and his contact information.   The tort claim notice referenced in the bankruptcy schedule outlines the underlying facts alleged in the complaint and the claims,

including a wrongful termination claim, discrimination claims, violations under the ADA and Equal Protection Clause, and that SPD further harmed Shoenthal by falsely asserting that his employment was terminated for a rule violation, and not in retaliation.

Shortly before the Defendants filed their motion to dismiss, the bankruptcy trustee received copies of the amended complaint in this case and a copy of Shoenthal's most recent demand letter with an attached copy of the tort claims notice (Filing No. 73-1). The bankruptcy trustee only entered into an agreement with Shoenthal's bankruptcy counsel and counsel in this case providing that Shoenthal may litigate the claims in the tort claim notice on behalf of the estate; however, a week *after* Defendants filed their motion to dismiss. *In re Marcus William Shoenthal et al.*, Cause No. 19-90485-AKM-13 (Filing No. 63).

Although there is evidence that Shoenthal's initial intent was to conceal this lawsuit, he ultimately disclosed the lawsuit while his bankruptcy case was still open, and he is currently pursuing the lawsuit with the approval of his bankruptcy trustee and on behalf of his creditors. The equitable doctrine of judicial estoppel ceases to be equitable when employed to injure creditors who are themselves victims of the debtor's deceit. *Cannon-Stokes*, 453 F.3d at 448. Shoenthal is presently pursuing claims against Defendants on behalf of the creditors. His disclosure made the trustee aware of the litigation, and the trustee subsequently decided its value to the involved creditors. This protects Shoenthal from an inference on summary judgment that he deliberately concealed his claim from the bankruptcy trustee and his creditors. *See Ah Quin v. County of Kauai Dep't of Transp.*, 733 F.3d 267, 272-73 (9th Cir. 2013) (explaining that presumption of deceit does not arise if debtor corrects omissions from bankruptcy schedules in manner that permits bankruptcy court to reprocess the case "with the full and correct information"). If the Court discretionarily estops Shoenthal from pursuing claims against the Defendants, it only

punishes the creditors, which is contrary to the purpose of judicial estoppel in the bankruptcy context. *See Biesek v. Soo Line R. Co.*, 440 F.3d 410, 413 (7th Cir. 2006) (warning against the use of the doctrine of judicial estoppel to further harm creditors by preventing the estate from recovering assets that could be used to pay the creditors). Thus, the Court **denies** summary judgment on the judicial estoppel doctrine.

### 2. Section 1983 Claim

Disabled individuals are protected by the Equal Protection Clause of the Fourteenth Amendment. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985); *United States v. Harris*, 197 F.3d 870, 876 (7th Cir. 1999). The Equal Protection Clause "commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike," *Griffin v. Sanders*, No. 19-cv-637, 2022 WL 196458, at *6 (S.D. Ind. Jan. 20, 2022) (quoting *City of Cleburne*, 473 U.S. at 439 (internal citations removed)), and generally protects people who are treated differently because of membership in a suspect class or who have been denied a fundamental right. *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 601 (7th Cir. 2016). The United States Supreme Court has held that "disability is not a 'suspect classification' under the Equal Protection Clause, so a plaintiff alleging an equal-protection violation on the basis of their disability **also has to show** that the state actor's discrimination was not **rationally related to a legitimate state interest**." *Doe v. Bd. of Educ. of City of Chicago*, 611 F. Supp. 3d 516, 532 n.5 (N.D. Ill. 2020) (emphasis added, collecting cases). *See also Erickson v. Bd. of Governors of State Colleges & Universities for Ne. Illinois Univ.*, 207 F.3d 945, 950 (7th Cir. 2000) ("*Cleburne* held that the rational-basis test likewise governs disabilities.").

Shoenthal neither argues any violation of the Equal Protection Clause related to his termination, nor opposes summary judgment as to the Spring 2020 hiring process (Filing No. 96-

1 at 54-57).  Instead, he argues that Defendants are liable due to the City's "ongoing refusal to consider his candidacy" after Spring 2020, and Defendants' "refusal to allow him to try again" (Filing No. 96-1 at 54, 55).

This argument cannot save Shoenthal's claim.  Shoenthal has put forth no evidence that Defendants declined to accept or consider his candidacy following the Spring 2020 commissioning process.  To the contrary, the record demonstrates that Shoenthal would have been considered by the SPD and allowed to appear for the physical agility examinations that were offered or to retake a written examination upon submitting an application at some future point.  That Shoenthal understood Captain Watson to have indicated in Fall 2020 that he need not submit to the physical agility or written examinations, is not availing: applying is a prerequisite for consideration. As explained to Shoenthal, applications would be accepted up to the day of the agility test for Fall 2020.

Shoenthal's invitation for the Court to find that the failure by Defendants to consider an unsubmitted application in a single period amounts to a violation of his constitutional rights is unavailing.  *See Sembos v. Philips Components*, 376 F.3d 696, 702 (7th Cir. 2004) (finding in the age discrimination context that "employer cannot be liable for failing to hire a person who does not apply for a job").  *Cf. Konowitz v. Schnadig Corp.*, 965 F.2d 230, 234 (7th Cir. 1992) (concluding that an employer's failure to promote plaintiff or consider him for other openings with the company after a reduction in force did not lead to an inference of discrimination, since nothing in the record suggested that he had applied for any jobs or informed the company of his interest).

The designated evidence demonstrates that Defendants did not proscribe further progression through the commission process were Shoenthal to receive a passing grade on the baseline mental examination.  In his deposition, Shoenthal describes an October 2020 meeting in

which Captain Watson positively discussed his return to Public Safety Medical, the entity responsible for administering the mental examination which Shoenthal had previously failed.

Shoenthal does not argue that Defendants' policy of ending officers' candidacies upon failure of a mental examination fails rational basis review, and he agrees that requiring a mental examination as a condition of employment (as a police officer) is rational. Instead, he argues that Defendants lack a rational basis in refusing an attempt at a new mental examination. (Filing No. 96-1 at 55.)

> Rational basis review requires the plaintiff to prove that (1) the state actor intentionally treated [him] differently from others similarly situated; (2) this difference in treatment was caused by [his] membership in the class to which [he] belongs; and (3) this different treatment was not rationally related to a legitimate state interest.

*Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009).

The Courts analysis hinges on the third element of rational basis review—whether Shoenthal has carried his burden in showing that any alleged discrimination by Defendants was not related to a legitimate state interest. Considering the evidence in the light most favorable to Shoenthal, the Court assumes that Shoenthal satisfies the first and second elements of rational basis review — that he was intentionally treated differently than other similarly situated persons, and that the differential treatment was based upon his PTSD.

> Under traditional equal protection analysis, it is a violation of the Fourteenth Amendment for the state to discriminate against disabled persons in an irrational manner or for an illegitimate reason. However, the Fourteenth Amendment allows the state to single out the disabled for different treatment so long as it has a rational or legitimate purpose.

*Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732, 738 (7th Cir. 2000) (citing *Cleburne*, 473 U.S. 432). That is, rational distinctions based on disabilities comport with the Constitution. *Erickson*, 207 F.3d at 950. A state "may rely on disability 'as a proxy for other qualities, abilities, or

characteristics that are relevant to the State's legitimate interests.'"  *Stevens*, 210 F.3d at 738 (quoting *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 84 (2000).  "Furthermore, it is presumed that distinctions made by the State that are based on disability are rational and legitimate." *Id.* (citing *Kimel*, 528 U.S. at 84; *Cleburne*, 473 U.S. 432).  The burden rests on the individual to demonstrate that the government's claimed purpose is illegitimate or that the means used to achieve that purpose are irrational.  *Id.* (citing *Kimel*, 528 U.S. at 84).

Meeting this third element is a difficult hurdle for any plaintiff.  "There is a rational basis for an action if there is 'any reasonably conceivable state of facts that could provide a rational basis.'"  *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 263 F. Supp. 3d 705, 728 (N.D. Ill. 2017) (quoting *Srail*, 588 F.3d at 943).  "A rational basis 'may be based on rational speculation unsupported by evidence or empirical data.'"  *Srail*, 588 F.3d at 947 (quoting *F.C.C. v. Beach Commc'n, Inc.*, 508 U.S. 307, 314-15 (1993)).

Even assuming the evidence demonstrates reluctance on the part of Defendants to permit Shoenthal to take a mental examination prior to a certain future date, this does not overcome Defendants' rational basis for relying on the recommendation of Public Safety Medical. Given his PTSD symptoms and high risk for emotional distress and performance problems, Public Safety Medical believed Shoenthal would not receive a passing grade on the mental examination without a significant period of stability in his current mental health symptoms.  There is a rational basis in assuming that Public Safety Medical desired examinees to be free of PSTD symptoms for the same amount of time that they were experienced. While the Court could opine as to numerous reasonable inferences that provide a rational basis against incurring a second failure prematurely, it need not as Shoenthal has not met his burden to demonstrate that the purpose was based on an illegitimate or irrational purpose.

The Court furthermore finds that the individual Defendants' qualified immunity defeats Shoenthal's claims against them. Qualified immunity attaches when an official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 79-80 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted)).  While the case law "do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 80 (quoting *Mullenix*, 577 U.S. at 12).

In other words, immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Estate of Davis v. Ortiz*, 987 F.3d 635, 638 (7th Cir. 2021). Once a government official invokes qualified immunity in a section 1983 suit, the burden shifts to the plaintiff to defeat the defense by showing: (1) that a trier of fact could conclude that the officer violated a federal right, and (2) that the unlawfulness of the conduct was clearly established at the time the officer acted. *Id.* (quoting *D.C. v. Wesby*, 583 U.S. 48, 62-63 (2018)).  Shoenthal's assertion that disability discrimination in public employment is a clearly established right is generic, and he fails to specifically establish that legal principle "clearly prohibits the [officials'] conduct in the particular circumstances before [them]." *Wesby*, 583 U.S. at 63.  *See also id.* at 63-64 ("The rule's contours must be so well defined that it is clear to a reasonable [official] that his conduct was unlawful in the situation he confronted. This requires a high 'degree of specificity.' We have repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" (Internal citations omitted.))  The cases to which Shoenthal cites involve diverse facts and alleged discriminations in various distinguishable contexts. Shoenthal does not

carry his burden in establishing that the unlawfulness of the conduct for which he complains was clearly established at the time Defendants acted.

Accordingly, the Court **grants** summary judgment as to Shoenthal's Section 1983 claims.

### 3.    Discrimination under the ADA and Rehabilitation Act

Shoenthal argues the Defendants refused to consider his candidacy for police officer commission, because of his PTSD, in violation of the ADA and the Rehabilitation Act.  The ADA and the Rehabilitation Act, statutes which are nearly identical, prohibit an employer from discriminating against a "qualified individual" with a disability because of that disability.[7]  *See* 42 U.S.C. § 12112(a); 29 U.S.C. § 794(a).  *See also Jackson v. City of Chicago*, 414 F.3d 806, 810, 810 n.2 (7th Cir. 2005) (quoting *Silk v. City of Chicago*, 194 F.3d 788, 798).  To make a *prima facie* case of discrimination, a plaintiff must show: (1) that he suffers from a disability as defined in the statutes; (2) that he is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) that he has suffered an adverse employment action as a result of her disability.  *Silk*, 194 F.3d at 798 n.6.  To avoid a motion for summary judgment, Shoenthal must present evidence that, if believed by a trier of fact, would establish each of these elements.  *Whitaker v. Wisconsin Dep't of Health Servs.*, 849 F.3d 681, 684 (7th Cir. 2017).  The Rehabilitation Act provides that the ADA standards are to be applied to determine whether the Rehabilitation Act has been violated, *see* 29 U.S.C. § 794(d), thus, the provisions and standards of the ADA are herein referenced.  *Jackson*, 414 F.3d at 811.

---

[7] The elements of discrimination under both statutes are substantially similar; the Rehabilitation Act is distinguishable only because it is limited to programs receiving federal financial assistance. *Silk v. City of Chicago*, 194 F.3d 788, 798 n.6 (7th Cir. 1999). That Defendants receive federal financial assistance is not at issue, nor do Defendants dispute that they meet this element of the Rehabilitation Act.

Shoenthal's claims for discrimination fail because he does not demonstrate that he is a "qualified individual" at the relevant time following his failure of the mental examination and leading to the subsequent revocation of Defendants' conditional offer.[8] The Court applies a two-step test to determine whether someone is a "qualified individual".  "First, we consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015) (quoting *Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001)). "If he does, **then** we must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* (emphasis added).

As Defendants argue, membership in the 1977 Fund is a condition precedent for employment with Seymour's police department pursuant to state law.  Ind. Code § 36-8-3-21(b) ("An individual may not be employed by a unit after May 31, 1985, as a member of the unit's fire department or as a member of the unit's police department unless the individual meets the conditions for membership in the 1977 fund.").  *See also Moore v. Muncie Police & Fire Merit Comm'n*, 312 F.3d 322, 323 (7th Cir. 2002) (discussing requirement in same subsection as applied to firefighters). Only those applicants who "pass[] the baseline statewide physical and mental examination" under Ind. Code § 36-8-8-19 shall be members of the 1977 Fund.  Ind. Code § 36-8-3.2-2.   The mental examination in question, the April 7, 2020 Public Safety Medical psychological evaluation administered to Shoenthal and "conducted as part of [his] application for

---

[8] The Court agrees Mr. Shoenthal is a qualified individual in certain respects, and he successfully completed many of the requirements of the Commissioning Process; namely, he passed the physical agility test and excelled in the written examination and during his interview. When this Court finds he was not a qualified individual, it means he was not qualified as a candidate for further consideration by the Indiana Public Retirement System and, by extension, as a police officer because of the legitimate requirements imposed by Indiana statute.

a position as a police officer," had the explicit purpose of "assess[ing] his ability to adapt to the social, emotional, and behavioral demands of that position" (Filing No. 92-3 at 1).  Statutorily, the Indiana legislature has decided that the "purpose of the baseline statewide mental examination is to determine if the police officer or firefighter is mentally suitable to be a member of the department."  Ind. Code § 36-8-8-19(c).

Shoenthal does not argue that a disputed material fact exists as whether to the Public Safety Medical psychological evaluation, as administered, properly constitutes a baseline statewide mental examination for purposes of determining pension eligibility under Ind. Code § 36-8-8-19,[9] nor that the local board's determination of the related standards for passage of the baseline mental examination did not "reflect the essential functions of the job" or were not "consistent with business necessity."  Ind. Code § 36-8-8-19(c)(1), (2).  Nor does he argue or point to evidence establishing that any additional local mental standards compelled by the local board under Ind. Code § 36-8-3.2-6, were improperly imposed. *See* Ind. Code § 36-8-8-19(f).

When Shoenthal did not pass the Public Safety Medical psychological evaluation,[10] he no longer qualified for a statutorily mandated condition precedent to the employment he sought in applying during the Spring 2020 hiring process, a dispositive fact to which his own deposition testimony alludes. Ind. Code § 36-8-3-21(b) indicates plainly: "An individual may not be employed by a unit after May 31, 1985,. . . as a member of the unit's … police department unless

---

[9] Mr. Shoenthal indeed admits to failing "the 'state mandated mental examination'" (Filing No. 96-1 at 51).

[10] To the extent that Shoenthal asserts that Seymour's Police Pension Board of Trustees, as its Local Board, was responsible for administering his mental examination, the Court notes that he does not designate evidence that creates a factual dispute that the local board had not designated Public Safety Medical to administer the examination, consistent with Ind. Code § 36-8-8-19(c). While he claims that "Seymour did not, however, submit Public Safety Medical's amended Evaluation to the Pension Board for consideration," Filing No. 96-1 at 13,. Shoenthal fails to establish that the local board did not properly meet its requirement of "determin[ing] the standards for passage," which this Court finds to be the only pertinent mandate set forth by Ind. Code § 36-8-8-19(c) and 35 I.A.C. 2-9-4(c).

the individual meets the conditions for membership in the 1977 fund."  Ind. Code § 36-8-8-19 similarly mandates that a candidate "passes the local . . . mental standards, if any, established under IC 36-8-3.2-6, . . . and the baseline statewide mental examination described in subsection (c)" before being further considered.  Shoenthal did not do so, and therefore was not considered further nor eligible to become a police officer.

While this Court finds Shoenthal's passage of the mental examination to be a statutorily mandated, legitimate prerequisite for which he concededly did not satisfy, it pauses to discuss his argument that the same mental examination constitutes an impermissible "qualification standard." An employer may apply "qualification standards, employment test or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities" under the ADA, but only if they are shown to be "job-related for position in question" and "consistent with business necessity." 42 U.S.C. § 12112(b)(6). *See also Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000) (quoting 42 U.S.C. § 12113(a)).

Shoenthal relies heavily on *Pontinen v. United States Steel Corp.*, in which the Seventh Circuit Court of Appeals emphasizes the "crucial" difference distinguishing "qualified individual" from "qualification standards": "it is the *defendant-employer's burden* to show that qualification standards that 'tend to screen out . . . individual[s] with a disability' escape liability because those qualification standards are necessary to prevent 'a direct threat to the health or safety of other individuals in the workplace.'" 26 F.4th 401, 406 (7th Cir. 2022) (emphasis added) (quoting 42 U.S.C. § 12113(a)-(b); *Branham v. Snow*, 392 F.3d 896, 907 (7th Cir. 2004)). The *Pontinen* defendant-employer, United States Steel Corporation ("USS"), as part of its own considerations and assessments of qualification for its Utility Person position, required candidates to meet separate requirements of the U.S. Department of Transportation's (the "DOT") Federal Motor

Carrier Safety Administration Medical Handbook, found at 49 C.F.R. § 391.41 (2021), as a condition of their contingent offer.  26 F.4th at 404.  When Pontinen was determined, based upon DOT regulation, to be able to work only with restrictions that USS would not accommodate, USS rescinded his contingent offer.

While both *Pontinen* and the case here involve relevant "qualifications" promulgated by government entities, the differences are crucial.  In *Pontinen*, USS itself adopted and relied upon the DOT's handbook as a guide to determine whether employees were qualified for safety sensitive or critical positions, relying on the DOT's relevant advisory and non-binding guidelines for applicants who had a seizure disorder.  Here, it is the Indiana legislature, and *not* the employer City, that has made the choice for the SPD to refer to the standards contained with the baseline statewide mental examination. Thus, long before Shoenthal came along, the state legislature had reasonably determined for the City, like it determined for all other Indiana municipal units, the short list of non-advisory, *binding* considerations that Defendants must follow in commissioning police officers, and it includes among this list of "qualifications" the passage of the mental examination.

The passage of the mental examination here is more akin to a "prerequisite" or "other job-related requirement[]," *see Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 242 (7th Cir. 2018) (citing *Leisen v. City of Shelbyville*, 153 F.3d 805, 808 (7th Cir. 1998) ("Passing an exam required for licensure would fall into th[e] category [of prerequisites].")), and less like a "qualification standard." *Compare* 29 C.F.R. § 1630.2(m) ("The term 'qualified,' with respect to an individual with a disability, means *that the individual satisfies the requisite* skill, experience, education and *other job-related requirements of the employment position* such individual holds or desires . . . .) (emphasis added), *with* 29 C.F.R. § 1630.2(q) ("Qualification standards means the personal and

28

professional attributes including the skill, experience, education, physical, medical, safety and other requirements *established by a covered entity* as requirements which an individual must meet in order to be eligible for the position held or desired.") (emphasis added).  And, by receiving a failing score on the Public Safety Medical psychological evaluation, Shoenthal did not meet this prerequisite or other job-related requirements.

Notwithstanding this characterization, Defendants would still be able to employ a mental examination as a *qualification standard*, because, given the record presented, albeit limited, a reasonable trier of fact could find that the appropriate psychological screen is job-related and consistent with business necessity where the selection of individuals to be commissioned as police officers is concerned.  *See Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 731 (7th Cir. 2020) (quoting *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009)) (in the context of fitness-for-duty evaluations, stating that "[b]ecause Kurtzhals was a police officer and responsible for public safety, his 'well-being was essential not only to [his] safety but to the public at large; thus, the Department had a particularly compelling interest in assuring that [he] was both physically and mentally fit to perform [his] duties'").  The mental examination included in the Seymour police officer hiring process assessed applicants' ability to adapt to the social, emotional, and behavioral demands of the position. *See also* Ind. Code § 36-8-8-19(c) ("The baseline statewide mental examination and related standards must: (1) reflect the essential functions of the job; [and] (2) be consistent with business necessity . . . .").  Shoenthal does not present evidence that persuades this Court otherwise.

This Court agrees with Defendants that this case is akin to *Cook v. City of Philadelphia*, No. 14-5842, 2015 WL 4273319 (E.D. Pa. July 15, 2015), *aff'd*, 649 F. App'x 174 (3d Cir. 2016). In affirming the district court's decision on appeal, the Third Circuit Court of Appeals stated:

> [Cook] misses the point. Pennsylvania state law requires every police candidate be certified by a psychologist to ensure they are "psychologically capable to exercise appropriate judgment or restraint in performing the duties of a police officer." Cook failed to meet this requirement and has suggested no reasonable accommodation with which he would be qualified for the position of police officer. Other than blanket allegations, he has failed to articulate any facts that would support a claim of bias in the statutorily-required psychological examination. Such screening is "job-related" and "consistent with business necessity where the selection of individuals to train for the position of police officer is concerned." Therefore, Cook has not set out a prima facie case of employment discrimination and summary judgment was properly granted.

649 F. App'x at 176-177.  Shoenthal has failed to meet the passage requirement set forth in the statute, and has not identified a reasonable accommodation that, if provided, would qualify him for the position of police officer, *see* 29 C.F.R. § 1630.2(m). Accordingly, this Court finds that he has not demonstrated that he was qualified for the position in question.

Separately, Defendants can lawfully require the medical examination in question — and condition offers on successful results — if they satisfy the three requirements set forth in 42 U.S.C. § 12112(d)(3):

> (A) all entering employees are subjected to such an examination regardless of disability;
> (B) information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, . . . and;
> (C) the results of such examination are used only in accordance with this subchapter.

On the evidence in the record taken most favorably to Shoenthal, these requirements are indeed satisfied. Namely, the SPD satisfies each requirement of 42 U.S.C. § 12112(d)(3) by mandating all entering police officers pass the psychological evaluation administered by Public Safety Medical, as designated by Seymour's local board.

Finally, assuming *arguendo*, Shoenthal could demonstrate he was qualified to perform the essential functions of the police officer position with or without reasonable accommodation, he still does not show that he has suffered an adverse employment action *as a result of the disability*

he asserts.  As discussed above, the decision to not commission Shoenthal as part of the Spring 2020 cycle was based on his failure to pass the Public Safety Medical psychological evaluation. And, as discussed at length in the previous analysis, the decision to not commission Shoenthal as part of the Fall 2020 cycle was based on a failure to apply. Neither is an employment action taken because of his PTSD.

Since Shoenthal fails to meet his burden in making out a *prima facie* case of discrimination, the Court **grants** summary judgment as to his discrimination claims.

### 4.    Retaliation under the ADA and Rehabilitation Act

Shoenthal argues the Defendants unlawfully fired him in retaliation for his complaints about disability discrimination and retaliation. As with his claims of discrimination, the Court will consider the question of retaliation under both acts together, as the acts are nearly identical substantively. *See Silk*, 194 F.3d at 798 n.6. *Compare Freelain v. Village of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018), *with Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814 (7th Cir. 2015). For a retaliation claim under the ADA, a plaintiff must submit evidence that (1) she engaged in protected activity, (2) her employer took an adverse action against her, and (3) there was a "'but' for' causal connection between the two." *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020).

In this case, only the third element, causation, is disputed.  Shoenthal's March 3, 2021 letter detailed his "sincere and reasonable belief" that he was opposing an unlawful employment practice. *See Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008) ("[S]he need only show that, when instituting her grievance, she had a sincere and reasonable belief that she was opposing an unlawful practice.") (citations omitted). He was terminated after the receipt of the letter. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015) ("A termination is of

course a materially adverse employment action.") (citing *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007)).

To determine if there is a genuine issue of material fact as to whether a plaintiff's protected activity caused his termination, the court must "consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation." *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017) (citing *Ortiz v. Werner Enters.*, Inc., 834 F.3d 760, 764-66 (7th Cir. 2016)) (applying *Ortiz*'s "evidence as a whole" standard to retaliation claims under Title VII and the Family Medical Leave Act); *Rowlands v. United Parcel Serv.–Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (applying *Ortiz* to a retaliation claim under the ADA).

Circumstantial evidence of causation may include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Rowlands*, 901 F.3d at 802 (alteration in original) (quoting *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017)). Each of these categories can suffice by itself to preclude summary judgment, depending on its strength in relation to the other evidence, but plaintiffs may also use them together. *Castro*, 786 F.3d at 565 (7th Cir. 2015) (citing *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994)).

Shoenthal maintains that Defendants' retaliation need only be inferred from the chronology of Defendants' receipt of his letter on March 3, 2021 and their subsequent termination of him on March 26, 2021, ([Filing No. 96-1 at 39](#) (quoting *Sweet v. Town of Bargersville*, No. 18-cv-1950, 2020 WL 3060384, at *3 (S.D. Ind., June 8, 2020)), or alternatively in conjunction with other

evidence of the causal link between his protected activity and the adverse action of his termination. *Id.* at 40 (quoting *Lang v. Ill. Dep't of Child & Family Servs.*, 361 F.3d 416 (7th Cir. 2004)).

### a.   Suspicious Timing

On its face, the timing here appears suspicious; indeed, the Seventh Circuit has held that summary judgment is inappropriate where as much as a month's delay occurred between the protected activity and adverse employment action, where that suspicious timing was combined with additional evidence of pretext. *See, e.g.*, *Coleman*, 667 F.3d at 860 (one month between filing of complaints alleging discrimination and termination sufficient when combined with evidence that the policy the plaintiff allegedly violated did not apply and was not evenhandedly enforced). While suspicious timing can sometimes raise an inference of a causal connection, temporal proximity alone is "rarely sufficient" to establish causation. *Castro*, 786 F.3d at 565 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). This is especially true where "a significant intervening event separates an employee's protected activity from the discharge." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937 (7th Cir. 2022) (cleaned up) (quoting *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011)).

As Defendants point out, a second dispatcher, Moss, resigned because of Shoenthal's behavior *after* receipt of the March 3, 2021 letter but *before* Chief Lucas contacted White and Shoenthal's eventual termination. This breaks any causal connection between Shoenthal's termination and his complaint letter and supports the Defendants' asserted link between Shoenthal's continued violations of the department's policies and his termination.

### b.   Evidence of Pretext

Shoenthal next attempts to contextualize the three-week period by pointing to his recollection of the March 26, 2021 meeting, which he asserts directly contradicts Defendants' account of the meeting *viz-a-viz* White. He contends her decision to terminate him was not caused

33

by his actions at the time and he argues instead that White's account of the termination meeting and any decisions made during it is pretextual and deserves an "infer[ence] that White herself was motivated to terminate Shoenthal's employment in retaliation" of the March 3, 2021 letter (Filing No. 96-1 at 42).  For purposes of summary judgment, the Court accepts that Shoenthal did not lose his temper, yell, raise his voice, or use vulgar language during the termination meeting, and he denies calling Griffin derogatory names or making lewd accusations about her career on March 26, 2021 or otherwise.

However, Defendants have offered a legitimate, nondiscriminatory reason for Shoenthal's termination; namely, that White, knowledgeable of various allegations that Shoenthal had violated the disciplinary policy, conducted an independent investigation before then speaking with Shoenthal and decided, during that meeting, that the complaints corroborated by his behavior during the meeting deserved immediate termination (Filing No. 84-2 at 24-25 (quoting Filing No. 81-1 at 32-33)). To show this reason was pretextual, Shoenthal "must present evidence suggesting that [Defendants] [are] dissembling." *O'Leary*, 657 F.3d at 635. Pretext "concerns whether the stated reason was not merely erroneous or unfair, but a lie." *King*, 872 F.3d at 843 (citing *Coleman*, 667 F.3d at 852).  "[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee.  Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005).

Shoenthal's pretextual argument aimed at White's motives is inapt.  Even taking the assertions as true — including the assertion, in contradiction of the evidence in the record, that White knew of a threatened lawsuit prior to meeting with Shoenthal — none of the argument as to White's ultimate decision on March 26, 2021 or the circumstantial evidence Shoenthal puts forth

in support of it establishes that the City did not honestly believe its reasons for terminating Shoenthal. *See Parker v. Brooks Life Sci., Inc.*, No. 19-cv-4796, 2021 WL 3140768, at *7 (S.D. Ind. July 26, 2021) (quoting *Seymour-Reed v. Forest Pres. Dist. of DuPage Cnty.*, 752 F. App'x 331, 335 (7th Cir. 2018)) ("[P]retext analysis evaluates the honesty of the employer's explanation, not its validity or reasonableness."), *aff'd*, 39 F.4th 931 (7th Cir. 2022).

As has been said previously, this Court "is not in the business of evaluating 'whether the employer's proffered justification was accurate or even whether it was unfair. [The Court's] sole focus is whether the employer's stated reasons can be characterized as a falsehood rather than an honestly held belief.'" *Id.* (quoting *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020)). Similarly, this Court may not "not sit as a super-personnel department" or "court of industrial relations" to adjudge the sufficiency of White's investigation. *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 678 (7th Cir. 1997) (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).

Shoenthal's reliance on the Seventh Circuit's decision in *Castro* to make the same point concerning White is misplaced (Filing No. 96-1 at 41 (quoting 786 F.3d at 572)). Here, unlike the relevant plaintiff in *Castro*, various other co-workers' accounts chronicled Shoenthal's disruptive behavior, and the record establishes White was aware of these complaints as well as of Moss' resignation and his partial attribution to the hostile work environment created by Shoenthal's behavior. She reviewed Shoenthal's personnel file prior to the termination meeting and spoke with Moss. Her intent in meeting with Shoenthal was to further investigate the allegations against him by obtaining "his side of the story" (Filing No. 92-20 at 22; *see also* Filing No. 92-20 at 7 ("I wanted more details of the name-calling and things like that, and I also wanted to speak with Marcus and get his side of the story the next morning."), 48 ("And at that time my feeling was that

*I needed to get Marcus' side of the story*, and that's why I met with him.") (emphasis added)). Shoenthal has not pointed to evidence to show that White had additional discriminatory motivations in meeting with him beyond those she provides, or that she developed such motivations to lie during the meeting. *Cf. Castro*, 786 F.3d at 572 ("[T]his is not a case where a supervisor had to decide which of two conflicting stories to believe; Berry herself made the decisive recommendation to fire Florez, on advice from Strauss. They relied on their own accounts — not reports from co-workers or third parties — to justify Florez's termination. If, as Florez contends, Strauss and Berry are lying about these events, then a reasonable trier of fact could find that Strauss and Berry fabricated their reports to create a false reason for terminating him.").

Again, the only relevant inquiry here is into "the honesty of the employer's explanation, not its validity or reasonableness." *Seymour-Reed*, 752 F. App'x at 335. And Shoenthal's assessment of his own behavior does not disturb the controlling question of whether White honestly believed that Shoenthal's actions during the meeting corroborated the various allegations against him and, subsequently, that the demonstrated behavior merited termination — and neither do any inexactitudes in the timing of her meeting with Moss prior to terminating Shoenthal.

The remainder of Shoenthal's argument involving pretext, buried within his discussion of cat's paw liability, takes a swipe at Captain Watson and Chief Lucas, who he claims had retaliatory motives to terminate him since both "had each read the March 3 letter, which implicated them personally" (Filing No. 96-1 at 43). In light of the record in this case, Shoenthal does not satisfy his burden of "identify[ing] such weaknesses, implausibilities, inconsistencies, or contradictions" in the City's asserted reason "that a reasonable person could find [it] unworthy of credence." *Coleman*, 667 F.3d at 852 (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007)). The Court first notes that Chief Lucas did not impose any adverse employment action

36

nor make recommendations for such; and the intervening cause of Moss' resignation sufficiently dispels any inference of retaliatory motive.

This leaves Captain Watson's alleged retaliatory animus.  According to Shoenthal, the memorandum that Captain Watson had Ortman create to document coworkers' expressed concerns, including one such concern by a dispatcher on February 16, 2021, is inconsistent with a separate February 26, 2021 email from Ortman to Shoenthal stating the supervisor "never once had any personal issues" with Shoenthal (Filing No. 92-14 at 1).  This statement is not fatally inconsistent or otherwise incompatible with those in the memorandum. Instead, the Court notes that the email to which he points is more consistent with one of the reasons the City relied in terminating him: insubordination.  Shoenthal asserts inconsistencies in Captain Watson's deposition testimony about the pair of dispatchers who quit because of him, but the Court cannot agree as Captain Watson later corrected his recollection as to the sequence of their disclosures.  His quarrel with Captain Watson's characterization of the representations made to him during their late January meeting does not raise into question the undisputed fact that Captain Watson discussed the need to improve his attitude, which Shoenthal concedes (Filing No. 92-19 at 5).

Shoenthal points to evidence that it is the City's policy to "promptly and thoroughly investigate" reports of harassment and "take appropriate corrective action to end such conduct," and contends Captain Watson did not promptly investigate when the behavioral issues began in November 2020, take corrective action in the January meeting, or follow SPD's own progressive discipline process (Filing No. 96-1 at 45 (quoting Filing No. 79-4 at 8)).  Notwithstanding that Captain Watson requested Shoenthal's supervisor to have a discussion with him and share that Shoenthal's behavior was unacceptable, and that he took other corrective actions such as distributing employee expectations and collecting dispatchers' signatures, Shoenthal's

disagreements with the haste of Defendants' investigative efforts and heft of its corrective efforts do not establish that Defendants lied about their reasons.

The City was not required to abide by the steps in the progressive discipline process and could go directly to termination without any prior discipline. Indeed, the Employee Handbook provides, in the section outlining its progressive discipline process, that the City "reserves the right to determine the appropriate level of discipline for any inappropriate conduct, including . . . discharge," and the Handbook expressly prefaces its list of disciplinary violations by indicating that they "will result in discipline up to and including immediate termination" (Filing No. 79-4 at 14-15). The Handbook lists the disciplinary violations, including insubordination; unauthorized use or damage to office property; making false, vicious, or malicious statement concerning other employees; unlawful discrimination against or harassment of co-workers; threatening employees; using abusive, profane, or threatening language; and immoral or indecent conduct. *Id.* In short, since Defendants did not violate its own policy, this pretext argument fails. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 507 (7th Cir. 2014) (holding that plaintiff's pretext argument fails when defendant did not violate its own policy by dismissing without prior warning). *Compare with Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 980 (7th Cir.2000) (holding that where an employer's progressive disciplinary policy *precluded* the plaintiff's firing, that constituted evidence of pretext) (emphasis added).

The key inquiry is whether the evidence and all reasonable inferences in Shoenthal's favor would permit a factfinder to conclude that the protected activity of submitting the March 3, 2021 letter was the 'but for' cause of his termination. Because he does not designate evidence that taken

in combination with his suspicious timing argument allows a "rational trier of fact [to] infer" that Defendants stated reason for terminating him was a lie, Shoenthal's causation argument fails.[11]

As to Shoenthal's remaining allegations that Defendants unlawfully retaliated against him by applying heightened scrutiny to his work performance and opposing his application for unemployment benefits based on his earlier complaints in October 2020 and January 2021,[12] this Court finds that his communications during those meetings cannot be interpreted as protected activity.

To qualify as protected activity, an employee must communicate that they are opposing discrimination prohibited by the relevant statute. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663-64 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."); *Miller v. Am. Fam. Mut. Ins.*, 203 F.3d 997, 1008 (7th Cir.

---

[11] As for Mr. Shoenthal's claim involving the opposition of unemployment benefits in retaliation for the protected activity of the March 3, 2021 letter, this Court notes that an employer has the right to challenge a former employee's receipt of unemployment benefits. Unaware of any binding Seventh Circuit precedent to the contrary, the Court follows the lead of its sister court in the Northern District of Illinois, and it holds that alleged interference with Mr. Shoenthal's post-termination unemployment benefits cannot be considered an "adverse employment action" for purposes of his Rehabilitation Act claim. *See Allen v. Bd. of Trustees Rock Valley Coll.*, 2021 WL 4034067, at *4 (N.D. Ill. Sept. 3, 2021) (quoting parenthetically *Frederick v. Henderson*, 232 F. Supp. 2d 901, 916 (N.D. Ill. 2002)) ("An employer has a right to protest an employee's unemployment benefits if it reasonably believes it has legitimate grounds to do so. Thus, USPS's act of protesting Frederick's unemployment benefits, alone, was not an adverse employment action.").

[12] Mr. Shoenthal expressly concedes his ADA claims associated with heightened scrutiny or opposition to his unemployment insurance benefits "on exhaustion grounds" (Filing No. 96-1 at 48 n.10). A plaintiff wishing to bring a claim under Title I of the ADA in federal court must first file a charge with the EEOC within 300 days of the alleged violation. *See* 42 U.S.C. § 12117 (ADA provision adopting the procedures set forth in Title VII, 42 U.S.C. § 2000e–5); *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 636 (7th Cir. 2004) ("[A]n employee may sue under the … ADA only if he files a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice."). The plaintiff must present in the charge any claim he later wants to pursue in federal court. *See McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 481 (7th Cir. 1996) ("Generally, a Title VII plaintiff may bring only those claims that were included in her EEOC charge . . . ."); *Hillman v. Costco Wholesale Corp., Inc.*, No. 12 C 6012, 2014 WL 3500131, at *9-10 (N.D. Ill. July 14, 2014) (quoting *McKenzie*, 92 F.3d 473). As Mr. Shoenthal has failed to do so and does not now argue that these claims are properly before the Court, the claims are thereby **dismissed**.

2000) (finding no protected activity where plaintiff's complaint "concerned a general displeasure with being paid less than her co-workers given her longer tenure and the fact that she had trained some of them . . ." and not discrimination related to a protected class).  The facts under review make clear that Shoenthal conveyed displeasure, with not only favoritism of others and workplace conduct but also about shifting timelines for reconsideration and the requirements for applying to become a police officer, but he did not indicate the associated reasons why. His requests for support of information for the Public Safety Medical evaluation do not clearly express any underlying rationale, nor does expression of his feelings of being led on explicitly evince a connection to a protected class or provide facts sufficient to create such an inference.

Even assuming Shoenthal expressed his discontent ***because*** he perceived or felt disability discrimination, his reasons or perceptions are irrelevant unless they were communicated to Defendants.  *See Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997), ("Gleason claims in her deposition testimony that she '***feels***' that Novak's objectionable behavior 'encompassed . . . sexual discrimination,' but unless she made these 'feelings' known to her employer, they are irrelevant." (alteration in original)) *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061 (2002); *Sitar v. Indiana Dep't of Transp.,* 344 F.3d 720, 727-28 (7th Cir. 2003) ("Although an employee need not use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections, 'she has to at least say something to indicate her [gender] is an issue. An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints.'" (alteration in original) (quoting *Miller*, 203 F.3d at 1008)). Because there is no evidence that Shoenthal

expressed his complaints in terms implicating disability discrimination, his statements at the meetings were not protected activity.

Therefore, the Court **grants** summary judgment as to Shoenthal's retaliation claims.

## IV.     <u>CONCLUSION</u>

For the reasons discussed above, Shoenthal's Motion for Leave to File Surreply in Opposition to Summary Judgment, (<u>Filing No. 104</u>), is **GRANTED**, and Defendants' Motion for Summary Judgment, (<u>Filing No. 77</u>), is **GRANTED** as to all claims against Defendants.

Final judgment will issue under separate order.

**IT IS SO ORDERED.**

Date:   1/10/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Benjamin C. Ellis
HKM EMPLOYMENT ATTORNEYS LLP
bellis@hkm.com

Blake J. Burgan
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
bburgan@taftlaw.com

Kaitlin F. Voller
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
kvoller@taftlaw.com

Kristine Anne Gordon
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
kgordon@taftlaw.com